**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CHAD L. ROEBER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:17-CV-01931** |
| | § | |
| **NANCY A. BERRYHILL** | § | |
| Acting Commissioner of Social Security | § | |
| Administration, | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT AND GRANTING**
**DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Defendant's Motion for

Summary Judgment (Document No. 18), and Memorandum in Support (Document No. 19), and

Plaintiff's Motion for Summary Judgment (Document No. 22), and Defendant's Response

(Document No. 23). After considering the cross motions for summary judgment, the

administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set

forth below, that Defendant's Motion for Summary Judgment (Document No. 18) is GRANTED,

Plaintiff's Motion for Summary Judgment (Document No. 22) is DENIED, and the decision of

the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on January 9, 2018.
(Document No. 16).

1

# I. Introduction

Plaintiff, Chad L. Roeber, brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for disability insurance benefits ("DIB") and for supplemental security income ("SSI"). According to Roeber, substantial evidence does not support the ALJ's decision, and the ALJ, Gary J. Sutter, committed errors of law when he found that Roeber did not have an impairment or combination of impairments that met or medically equaled the severity of Listing 4.04, and that he erred in disregarding the opinion of Roeber's treating cardiologist, Salim Dabaghi, M.D. (Tr. 26, 34). Roeber seeks an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding his claim for further proceedings. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Roeber was not disabled as a result of his impairments, that the decision comports with applicable law, and that it should, therefore, be affirmed.

# II. Administrative Proceedings

On December 6, 2013, Roeber filed an application for DIB and for SSI on September 1, 2016. In both applications, Roeber claimed disability due to abdominal aortic dissection, renal failure, and hypertension. (Tr. 219-220, 233). Roeber alleged disability beginning October 10, 2008, forward. (Tr. 219). The Social Security Administration denied his applications at the initial and reconsidered stages. (Tr. 145-149, 151-153). Roeber then requested a hearing before an ALJ on February 23, 2015. (Tr. 155-156). The Social Security Administration granted his request, and the ALJ held a hearing on September 9, 2016. (Tr. 155-156). On December 19, 2016, the ALJ issued his decision finding Roeber not disabled. (Tr. 20-42).

Roeber sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 16-19). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Roeber's contentions in light of the applicable regulations and evidence the Appeals Council, on April 12, 2017, slightly modified the ALJ's decision and denied Roeber's request. (Tr. 4-8). The ALJ's findings and decision thus became final.

Roeber has timely filed his appeal of the ALJ's decision. Roeber has filed a Motion for Summary Judgment (Document No. 22). Likewise, the Commissioner has filed a Motion for Summary Judgment (Document No. 18). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 2053 (Document No. 10). There is no dispute as to the facts contained therein.

## III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is, only: "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or

without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

**IV. Burden of Proof**

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "'incapable of engaging in any substantial gainful activity'." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

20 C.F.R. §§ 404.1520, 416.910, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that

the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the

claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any

step in the process, the Commissioner determines that the claimant is or is not disabled, the

evaluation ends. *Leggett*, 67 F.3d at 564.

Here, the ALJ found at step five that Roeber was not disabled within the meaning of the

Act. Roeber argues that substantial evidence does not support the ALJ's decision. Roeber argues

that the ALJ erred in finding he did not meet a listing. Specifically, he argues that the ALJ did not

identify the particular listing Roeber did not meet. Roeber further argues that the ALJ erred in

discounting the June 17, 2015, opinion of his treating cardiologist Salim Dabaghi, M.D.

In determining whether substantial evidence supports the ALJ's decision, the court weighs

four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating,

examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence of

pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the

plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126. Any

conflicts in the evidence are to be resolved by the ALJ, and not the Court. *See Newton v. Apfel*,

209 F.3d 448, 452 (5th Cir. 2000) (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

**V. Discussion**

**A. Objective Medical Facts**

The medical records in the instant action reveal that Roeber has sought treatment for

symptoms related to his abdominal aortic dissection, renal failure, and hypertension.

Roeber was treated for an ascending and descending thoracic and abdominal aortic

dissection on October 11, 2008. (Tr. 299). He was life-flighted to Hermann Hospital after

6

collapsing at a football game. He underwent ascending aortic dissection repair, and descending dissection. (Tr. 299). He remained hospitalized until November 7, 2008. (Tr. 308). During his stay, Roeber developed acute renal failure. (Tr. 309). When discharged Roeber was clinically doing well and undergoing physical therapy and occupational therapy. He still required hemodialysis because his kidney function was not normal. (Tr. 309). Roeber's left atrial chamber was normal in size, as well as the right ventricular cavity, and the right atrial cavity. (Tr. 312). However, there was severe aortic regurgitation present and the aortic valve was trileaflet. (Tr. 312). Upon discharge, Roeber was instructed to not lift weight over 10 pounds for 6 weeks, and his follow up would be set with Dr. Safi. (Tr. 309). Roeber went under an echocardiogram on October 19, 2008. He had a normal ejection fraction at 65-70% with no significant valvular disease. A small effusion was noted. (Tr. 398).

Roeber was readmitted to Hermann Hospital after losing consciousness on December 5, 2008. (Tr. 408). In a preliminary evaluation of echocardiogram dated December 6, 2008, he had an increased pericardial effusion. (Tr. 398). There was, however, no evidence of compromise. Mild aortic insufficiency and a small intracavitary gradient were noted. (Tr. 398). On December 7, 2008, Dr. Dabaghi, Roeber's treating cardiologist, prescribed higher doses of beta blockers for rate and blood pressure control. (Tr. 399).

On December 3, 2008, Roeber had surgery on the entirety of the descending thoracic and abdominal aortas. (Tr. 465). Roeber recovered well from his surgery. (Tr. 465). However, he developed uncontrolled hypertension on December 5, 2008, a hematoma in the left arm, and status post brachial artery puncture. (Tr. 465). A radiology report dated December 5, 2008, showed a moderate to large right pleural effusion and compressive atelectasis at the right lung base, left lower lobe subsegmental atelectasis, and stable cardiomegaly. (Tr. 471). A cardiology

report dated December 18, 2008, Roeber was found to have stable clear lungs, costophrenic angles that were sharp but without effusions, a cardiac silhouette that was enlarged but stable, median sternotomy wires were noted in the midline, and the right central catheter was in stable position. (Tr. 473).

In an anglogram abdominal aorta VR exam dated December 16, 2008, revealed that Roeber had uncontrolled hypertension. (Tr. 474). The results of a CTA interventional exam dated April 3, 2009, showed that Roeber had a normal size heart and no evidence of pericardial or pleural effusion. (Tr. 477-478.). Roeber's lungs were found to be clear. His right kidney appeared atrophic. (Tr. 478). Roeber was found to have stable postsurgical changes related to repair of the thoracic ascending aorta, no interval changes in the caliber of the aorta with an aortic dissection, and an atrophic right kidney. (Tr. 478).

On June 28, 2009, Roeber was seen by Dr. Dabaghi at Memorial Hermann. (Tr. 479-480.). Roeber denied any chest pain, shortness of breath, nausea or vomiting, dyspnea on exertion, or fever or chills. (Tr. 485). Roeber's pulmonary vascularity was normal. (Tr. 487). Roeber's lungs were clear bilaterally and there were no pleural effusions. (Tr. 487).

On July 9, 2009, Roeber was admitted to Hermann Hospital for evaluation of a suspected thoracoabdominal aortic aneurysm. (Tr. 488). Roeber also had chronic renal insufficiency. (Tr. 488). Roeber underwent a chest x-ray, which revealed no significant pulmonary parenchymal abnormalities. (Tr. 489). Roeber was cleared for surgery from pulmonary standpoint. (Tr. 490). He was considered as a high risk for pulmonary operative complication given his previous history of postoperative difficulties. (Tr. 490).

On July 13, 2009, Roeber underwent abdominal aortic aneurysm reparation. (Tr. 503). Roeber was discharged on July 31, 2009. (Tr. 517). Roeber's recovery was uneventful and was

transferred to the floor on postoperative day 6; however, over the next 5 days, he developed renal

failure, fluid overload and was returned to the intensive care unit, at which point he was placed on

dialysis. (Tr. 517). He was discharged on July 29, 2009, with orders to be dialyzed as an

outpatient. (Tr. 517). An echocardiogram report dated July 30, 2009, Roeber's left ventricular

chamber size was mildly dilated with moderate concentric hypertrophy. (Tr. 520-521).

A diagnostic radiology report dated April 28, 2010, revealed that Roeber's aortic caliber

was slightly more prominent than on prior exam by up to 3mm of the level of the celiac artery,

but was otherwise unchanged in appearance, and evidence of the dissection remained intact. (Tr.

636-637).

On July 26, 2011, Roeber was admitted for a dissection of aorta thoracis. (Tr. 632). A CT

scan of the chest without contrast, a CT scan of the abdomen without contrast, and a CT scan of

the pelvis without contrast. (Tr. 632). The exams showed no significant changes in Roeber. (Tr.

632). In a report dated April 17, 2013, Roeber had a two-dimensional transthoracic

echocardiogram. Compared to a prior study, there was no significant change. (Tr. 737).

In a lower arterial report dated March 5, 2014, Dr. Dabaghi diagnosed Roeber as having

mild-moderate left lower extremity peripheral arterial disease with a left ankle brachial index of

0.76. (Tr. 787). The right lower extremity arterial Doppler appeared to be normal with the right

ankle brachial index of 0.89. The disease appeared to be at the level of the left iliac. (Tr. 787).

Roeber underwent mental status examination on March 18, 2014, with Daniela Costa,

Ph.D. (Tr. 789). According to the report, he presented with tired mood and restricted affect. (Tr.

791). His speech was coherent and relevant. (Tr. 791). No speech deficits were detected. (Tr.

791). As for thought process, Roeber showed no evidence of loose associations, circumstantial or

tangential, and he was able to interpret proverbs and similarities. (Tr. 791). As for perceptual

abnormalities, Roeber showed no evidence of perceptual abnormalities, nor of psychosis. (Tr. 791). Roeber's sensorium was intact and he was oriented to person, place, and time. (Tr. 792) He knew the current and former presidents, as well as current events, and he knew the state capitol. (Tr. 792). He did not know the direction the sun sets. (Tr. 792). He was able to recall 3 objects immediately and no objects with delay. (Tr. 792). He was able to recall three digits forward and none of the digits backward. (Tr. 792). He was able to complete all serial 7 and serial 3 calculations. (Tr. 792). Roeber could count down from 20 and was able to complete simple arithmetic. (Tr. 792). He could spell the word w-o-r-l-d forward and backward. (Tr. 792). Dr. Costa diagnosed Roeber with Adjustment Disorder with Mixed Anxiety and Depressed Mood. (Tr. 792). Dr. Costa opined that Roeber had deficits in immediate memory, and following directions that are 2-3 steps. (Tr. 792). Dr. Costa further opined that Roeber's physical condition may limit his ability to work. (Tr. 792).

On May 6, 2014, Roeber saw Dr. James Tran. (Tr. 814). Roeber complained of fatigue, and increasing shortness of breath with any physical exertion. (Tr. 814). Roeber stated he was unable to walk more than 30 minutes and was unable to sit for more than 30 minutes due to his lower back and leg pain. (Tr. 814). He was unable to climb stairs and had to rest multiple times prior to reaching the top of one flight of stairs. (Tr. 814). Roeber was experiencing recurrent chest pain. (Tr. 814). Dr. Tran's examination revealed that Roeber had a lower extremity trace edema. (Tr. 815). Neurologically, there was no focal deficit. (Tr. 815). Roeber had normal grip strength. (Tr. 815). Roeber had 5/5 both upper and lower extremity bilaterally on examination. (Tr. 815). There was no neuropathy. (Tr. 815). As for the Musculoskeletal examination, Roeber was able to tiptoe, ambulate on his heel, but was unable to squat. (Tr. 815). His back-range of motion was otherwise unremarkable. (Tr. 815). Roeber had no joint swelling or any redness in any joint. (Tr.

815). Dr. Tran wrote that Roeber's shortness of breath on exertion was most likely due to aortic regurgitation with loud murmur. (Tr. 815). Dr. Tran wrote that Roeber's symptoms were more consistent with cardiac problems, and that Roeber had difficulty climbing stairs or any type of exertion. (Tr. 815). Roeber's chronic fatigue and tiredness were secondary to his cardiac problem. (Tr. 815). Dr. Tran also noted Roeber could sit and stand and that he ambulated without use of any device. (Tr. 815).

In an echocardiography report dated May 12, 2014, Dr. Julio Teran, the radiologist, opined that: Roeber had a normal left ventricular sized, wall thickness and systolic function; diastolic relaxation impairment; enlarged left atrial dimension; normal right atrial dimension; dilated aortic root; mildly sclerotic mitral valve; mild mitral regurgitation; the aortic valve was mildly thickened; no aortic stenosis; anatomically normal tricuspid and pulmonic valves; normal pulmonary pressure. (Tr. 818).

Subsequently on August 18, 2014, in an Ankle Brachial Index Report, Roeber's right ankle-brachial index was in the normal range; the left ankle-brachial index was in the mildly abnormal range. (Tr. 955).

On September 21, 2014, Roeber was hospitalized following a motor vehicle accident. (Tr. 1109). He was diagnosed and treated for: multiple rib fractures; acute pancreatitis; acute pain and hypertension. (Tr. 1119). It was noted that his kidney function was deteriorating and his urine output was decreasing. (Tr. 1109). Additionally, it was noted that Roeber had significant worsening of the pulmonary kinetics on the ventilator. (Tr. 1109). Roeber's discharge condition was recorded as good. (Tr. 1119). The discharge paper shows that he was instructed ambulate with a walker and would need assistance and 24-hour supervision. (Tr. 1119).

Roeber was evaluated for physical therapy at TheraWorks on March 31, 2015. (Tr. 1872). Roeber showed symptoms consistent with rotator cuff impingement and a possible tear. (Tr. 1872). Roeber also was noted as having neck facet joint arthrosis or dysfunction. (Tr. 1872). In a subsequent visit on April 23, 2015, Roeber was assessed as having started with tolerance of exercises with complaints of pain, and he could not do the exercises at a stretch due to pain. (Tr. 1882). Roeber needed breaks between reps with the exercises. (Tr. 1882). On a visit on September 29, 2015, Roeber stated that he was not supposed to lift above 40 pounds and to not have his systolic BP drop below 115 points due to his cardiac issues. (Tr. 1886). According to the assessment, Vijeth S. Bekal, PT, rated Roeber's prognosis at the time of discharge as fair.

Here, substantial evidence supports the ALJ's finding that Roeber's abdominal aortic resection (congestive heart failure), renal failure, hypertension, degenerative disc disease of the lumbar spine, and depression were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment. The ALJ addressed Listing 4.04 in regard to Roeber's heart disease, and Listing 6.05 with respect to his kidney disease, and concluded that Roeber did not meet or equal either listing.

As for Listing 4.04, Listing 6.05, and his mental impairment, the ALJ wrote:

The claimant's heart disease does not meet or equal requirements of Listing 4.04 which requires:

A. Sign-or symptom-limited exercise tolerance test demonstrating at least one of the following manifestations at a workload equivalent to 5 METs or less:
1. Horizontal or downsloping depression, in the absence of digitalis glycoside treatment or hypokalemia, of the ST segment of at least -0.10 millivolts (-1.0 mm) in at least 3 consecutive complexes that are on a level baseline in any lead other than a VR, and depression of at least 1 minute of recovery; or
2. At least 0.1 millivolt (1 mm) ST evaluation above resting baseline in non-infarct leads both exercise and 1 or more minutes of recovery; or
3. Decrease of 10 mm Hg or more in systolic pressure below the baseline blood pressure or the preceding systolic pressure measured during exercise (see

4.00E0e) due to left ventricular dysfunction, despite an increase in workload; or

4. Documented ischemia at an exercise level equivalent to 5 METs or less on appropriate medically acceptable imaging, such as radionuclide perfusion scans or stress echocardiography.

OR

A. Three separate ischemic episodes, each requiring revascularization or not amenable to revascularization (see 4.00E9f), within a consecutive 12-month period (see 4.00A3e).

OR

B. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:

1. Angiographic evidence showing:
a. 50 percent or more narrowing of nonbypassed left main coronary artery; or
b. 70 percent of more narrowing of another nonbypassed coronary artery; or
c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or
e. 70 percent or more narrowing of bypass graft vessel; and
2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

The claimant's kidney disease does not meet or equal the requirements of Listing 6.05 because it is stable as discussed below.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or equal the criteria of listings 12.04 and 12.10. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulty in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

The undersigned gives great weight to the opinion of the State agency psychological consultants in this regard as noted below. (Exhibits 1 A, 3A).

In activities of daily living, the claimant has mild restriction. The consultative examiner reported that the claimant tends to watch TV, nap, play with dogs, and walk 3 to 4 times a day for 30 minutes. He needs assistance with lifting. He bathes independently. He prepares his own meals. His parents handle his finances. He handles his own transportation and shopping. Chores include washing dishes and cleaning. He wakes up at 6 a.m. and goes to bed at 12 a.m. (Exhibit 15F).

In social functioning, the claimant has mild difficulties. The consultative examiner reported that the claimant prefers solitary activities. He does not have conflict with anyone. He adapts well to changes.

With regard to concentration, persistence, or pace, the claimant has moderate difficulties. On the consultative mental status examination, the claimant was able to recall three digits forward and none of the digits backward. He was able to recall three digits forward and one of the digits backward. He was able to complete all serial 7 and serial 3 calculations. He could count down from 20 and was able to complete simple arithmetic. He could spell the word w-o-r-l-d forward and backward.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. Pursuant to 12.00(C)(4), an extended duration "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." The claimant has not been hospitalized for psychiatric treatment.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record fails to establish that the claimant experiences repeated episodes of decompensation. There is no evidence demonstrating that a marginal increase in mental demands or change in environment would cause him to decompensate. Finally, the record does not reflect that the claimant is unable to function outside a highly supportive living arrangement with a continued need for such an arrangement. (Tr. 26-28).

Substantial evidence supports the ALJ's determination that Roeber did not meet or equal listing

4.04, 6.05, or 12.04 and 12.10. While the ALJ did not specify the particular 4.04 listing, his

discussion shows he considered the Listing in total and any error was harmless.

RFC is what an individual can still do despite his or her limitations. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996). The responsibility for determining a claimant's RFC is with the ALJ. *see Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Here, the ALJ carefully considered all of the medical evidence in formulating an RFC that addressed Roeber's physical and mental impairments. The ALJ's RFC determination is consistent with Dr. Tran's, Dr. Dabaghi's, Dr. Rahman's, Dr. Jain's, and Daniel Costa's, Ph.D. opinions and the record as a whole. The ALJ, based on the totality of the evidence, concluded that Roeber could perform light work, occasionally lifting and carrying 20 pounds and frequently 10 pounds. The ALJ further determined that: Roeber can stand and walk four of eight hours each and sit six of eight hours for a full eight hour day; he has unlimited ability to push/pull and perform gross and fine movements except for occasional pushing with the lower extremities, bilaterally; Roeber can occasionally climb stairs but cannot climb ladders, ropes, or scaffolds or run; he can occasionally bend, stoop, crouch, crawl, balance, twist, and squat; he can occasionally be exposed to heights, dangerous machinery, and uneven surfaces; Roeber gets along with others, understands simple instructions, concentrates and performs simple tasks, and responds and adapts to workplaces changes and supervision, and gave specific reasons in support of this determination. This factor weighs in favor of the ALJ's decision.

## B. Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the

contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel,* 209 F.3d 448, 455 (5th Cir. 2000)(quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)). As such, if the treating physician's opinion is deficient in either respects, then it is not entitled to controlling weight. The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176. (quoting *Bradley v. Bowen,* 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinions and diagnoses of medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez,* 64 F.3d at 176.

Even if an opinion of a treating physician is not entitled to controlling weight because it was not consistent with the other substantial evidence of the record and was not well supported by medically acceptable clinical and laboratory diagnostic techniques, the opinion nonetheless is still entitled to deference and must be weighed in light of the following factors:

(1) the physician's length of treatment of the claimant,

(2) the physician's frequency of examination,

(3) the nature and extent of the treatment relationship,

(4) the support of the physician's opinion afforded by the medical evidence of the record,

(5) the consistency of the opinion with the record as a whole, and

(6) the specialization of the treating physician.

*Newton*, 209 F.3d at 456. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455.

The ALJ wrote:

> As for the opinion evidence, Dr. Dabaghi opined that the claimant could work in a sitting position for 6+ hours and perform a job standing and/or walking for one hour (Exhibit 34F). He had previously opined on January 29, 2014, that the claimant was unable to do "Regular work" due to malignant hypertension, dilated aorta, cardiomegaly, and valvular heart disease (Exhibit 29F/11-12). The undersigned gives little weight to these opinions because they are unsupported by the claimant's activities of daily living and medical evidence of record as discussed. Dr. Dabaghi also complete a Cardiac Impairment questionnaire on March 6, 2014, but assessed no functional limitations (Exhibit 23F). (Tr. 34).

The ALJ gave detailed reasons in assigning less weight to the opinion of Dr. Dabaghi concerning Roeber's inability to do "Regular work", which was not corroborated by his own treating records and earlier Questionnaire response. Upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

## C. Subjective Evidence of Pain

The third element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook v. Heckler,* 750 F.2d 391, 395 (5th Cir. 1985). The proper standard for evaluating pain is

codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423(d)(5)(A). "Pain constitutes a disabling condition under the [SSA] only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 860 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

Here, Roeber testified about his health and its impact on his daily activities. He offered no testimony or corroboration from his family or friends with respect to his complaints about his condition. Roeber testified that when he attempted to retrain himself to do something else besides being a mason, he tried several things but could not due to his inability to focus. (Tr. 52). He also stated that if he sat for too long it would hurt his back. (Tr. 52). Roeber stated that when he attempted to work in the office he could not due to his inability to focus and to stand for 45 minutes to an hour without hurting, or his feet going to sleep. (Tr. 62). He testified that on occasion he would smoke marijuana to help with his nightmares and inability to sleep. (Tr. 70). Roeber denied taking any mental medications. (Tr. 73). Roeber stated that he felt like he had

issues, and depression, but that he did not like asking for help and attempted to deal with it on his own. (Tr. 75). When asked how he was feeling having been at the hearing for about half an hour, Roeber reported his pain at a 7 on a scale from 1 to 10. (Tr. 80). Roeber stated that he can sit for up to 45 minutes until he starts hurting. (Tr. 81). He also said that he can walk for about 30-45 minutes without a cane. (Tr. 81). Roeber said he could lift 20 pounds when going for groceries. (Tr. 81). He also reported that he was capable of standing for around 45 minutes, less than an hour. (Tr. 82). As for exercises, Roeber stated that he stretches bands. (Tr. 82). Roeber described his daily activities as waking up around 8:30-9 a.m., watching TV, and feeding his dogs; making himself a sandwich or soup around lunchtime, and sitting around, afterwards watching TV, and playing with the dogs until his stepdaughter Katrina gets home around 4:30 in the afternoon. (Tr. 83). As for chores, Roeber stated that he washes clothes every once in a while, and that a load of laundry would take him all day to do. (Tr. 91-92). Roeber testified that he had a Harley Davidson motorcycle that his parents got him, and that he had last ridden it about a month prior to the hearing. (Tr. 85). Roeber reported that he had ridden it for about ten miles into the next town to visit a friend. (Tr. 85). Roeber stated riding for more than ten miles causes him discomfort. (Tr. 86). Roeber stated that he had been on three out-of-state trips and a few within Texas in the last three years. (Tr. 88). Roeber reported that he had also traveled to Coushatta with his parents a couple times to gamble. (Tr. 90). Roeber reported that on these trips his family would have to stop often and that he would have to take a lot of pain pills. (Tr. 91). He described that he usually sleeps with his feet above him and with pillows underneath his legs to keep them up. (Tr. 91-92). Roeber estimated that he could probably stand for a few hours in an eight-hour day and that for the remaining hours he would spend it sitting down or laying down. (Tr. 94). He further explained that sitting makes his legs go to sleep. (Tr. 94). Concerning his heart, Roeber stated that he would

experience shortness of breath and pain upon physical exertion. (Tr. 94). Roeber described the swelling he experiences in his hands, feet, and legs and that his cardiologist had given him a water pill to take to ease it. (Tr. 95). Roeber stated that he was currently wearing stocks up to his knees to help with the swelling in his legs. (Tr. 95). Roeber explained that every time he lays down he puts his feet up. (Tr. 96). Roeber explained that sitting in his house with his dogs lying on him created low-stress environment for him. (Tr. 99). He also reported trouble with memory. (Tr. 99). Roeber testified that he has troubles walking for long periods of time. (Tr. 102). Roeber said that he can pick up 20 pounds pretty comfortably. (Tr. 102).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History and Age

The fourth element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that Roeber was fifty-one years old at the time of the hearing, and had completed high school. His past relevant work experience was as a mason. The ALJ questioned Herman Litt, a vocational expert ("VE"), at the hearing about Roeber's ability to do his past work and his ability to engage in other gainful work activities. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation,

including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala,* 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling v. Halala*, 36 F.3d 431, 436 (5th Cir. 1994). The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Roeber was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Roeber was not disabled within the meaning of the Act, that substantial evidence supports the ALL's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED that Defendant's Motion for Summary Judgment (No.18), is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 22) is DENIED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this ___ day of August, 2018.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE